IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

BOBBIE J. BRITTON,              §
                               §
        Plaintiff,             §
                               §
V.                             §      CIVIL ACTION NO. H-05-4163
                               §
LINDA S. McMAHON[1],           §
ACTING COMMISSIONER OF THE SOCIAL§
SECURITY ADMINISTRATION,       §
                               §
        Defendant.             §

**MEMORANDUM AND ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court in this social security appeal is Defendant's Motion for Summary Judgment (Document No. 8), and Memorandum in Support (Document No. 9), Plaintiff's Response to Defendant's Motion for Summary Judgment (Document No. 12), Plaintiff's Motion for Summary Judgment (Document No. 10), and Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 11). Having considered the cross motions for summary judgment, the administrative record, and the applicable law, the Court ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 8) is DENIED, Plaintiff's Motion for Summary Judgment (Document No. 10) is GRANTED, and the decision of the Commissioner is REMANDED for further proceedings.

---

[1] On January 20, 2007, Linda S. McMahon became the Acting Commissioner of the Social Security Administration. As such, she is substituted for Commissioner Jo Anne B. Barnhart as defendant in this suit.

## I.  Introduction

Plaintiff  Bobbie Britton ("Britton") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").  Britton argues that substantial evidence does not support the ALJ's decision, and that the ALJ, Richard L. Abrams, committed errors of law when he found that  Britton retained the residual functional capacity ("RFC") for light work, that Britton could perform her past relevant work as a security guard/supervisor, a substitute teacher and a drug coordinator, and that she was therefore, not disabled.   Britton contends that the ALJ failed to apply the appropriate legal standards and that substantial evidence does not support the ALJ's decision.  According to Britton, the ALJ  erred by failing to develop the record concerning epilepsy, and in particular, whether she met or equaled a listing based on the frequency of her seizures, and by failing to consider her sleep apnea, obesity, and right hand weakness in formulating her residual functional capacity.  Britton  moves the Court for an order reversing the Commissioner's decision and awarding benefits, or in the alternative, an order remanding her claims for further proceedings.   The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Britton was not disabled as a result of her impairments, the decision comports with applicable law, and that it should therefore be affirmed.

## II.  Administrative Proceedings

Britton applied for DIB and SSI benefits on September 16, 2003, claiming that she has been unable to work since July 15, 2003, due to seizures, hypertension, right side numbness and depression. (Tr. 51-53, 337, 339).  The Social Security Administration denied her applications at the initial and reconsideration stages. (Tr. 24-37,341-354).  After that, Britton requested a hearing before

an ALJ. (Tr. 38-39). The Social Security Administration granted her request (Tr. 40-41, 46-50) and the ALJ held a hearing on December 2, 2004, at which Britton's claims were considered *de novo*. (Tr. 377-444). On March 11, 2005, the ALJ issued his decision finding Britton not disabled. (Tr. 10-19). The ALJ found that Britton had not engaged in substantial gainful activity since the alleged onset of disability. At steps two and three, he found that Britton had status post transient ischemic attack, status post left foot injury, a seizure disorder, anemia, and depression, all of which are severe impairments within the meaning of the Act, but that these impairments did not meet or equal the requirements of a listed impairment. Based on the medical records, the testimony of Britton, and her daughter, the testimony of a medical expert, John Anigbogu M.D., who specializes in internal medicine, and the testimony of a vocational expert, Karen Nielsen, Ph.D., the ALJ concluded that Britton's major problem was her seizures, but that her complaints were not credible. The ALJ wrote:

> The claimant testified that she cares for her five grandchildren despite having daily headaches, fainting twice a week, pain in her hands and back, frequently falling asleep and seizures twice a week. The undersigned finds that the claimant's major problem is seizures. The medical evidence indicates that if her Dilantin is at therapeutic levels her seizures remain under control but when she fails to properly take her medications it results in post ictal weakness versus transient ischemic attacks. While hospitalized for seizures, her neurological examinations and physical examinations are normal and her Dilantin was found to be at sub-therapeutic levels. The United States Administrative Law Judge is guided, in part by Social Security Ruling 87-6 (Cumulative Edition, 1987) which states that due to medical advances, most epileptic seizures are controllable and individuals who receive appropriate treatment are able to work. Situations where the seizures are not under good control are usually due to the individual's noncompliance with the prescribed treatment rather than the ineffectiveness of the treatment itself. Noncompliance is usually manifested by failure to continue ongoing medical care and to take medication at the prescribed dosage and frequency. Determination of blood levels of anticonvulsive drugs may serve to indicate whether the prescribed medication is being taken. Further, all diagnostic testing results were normal. The claimant's subjective allegation is not supported by the objective medical evidence; therefore her testimony is not credible. (Tr. 17-18).

The ALJ further found that Britton had the residual functional capacity ("RFC") to perform light work, restricted to the extent that she should avoid hazards such as dangerous machinery, heights and driving a motor vehicle because of her seizure, and that she could perform her past relevant work as a security guard/supervisor, a substitute teacher and a drug coordinator. Based on those findings, the ALJ determined that Britton was not disabled within the meaning of the Social Security Act.

Britton then asked for a review by the Appeals Council of the ALJ's adverse decision. (Tr. 355-376). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; or (4) a broad policy issue may affect the public interest. 20 C.F.R. §§ 404.970, 416.1470. After considering Britton's contentions in light of the applicable regulations and evidence, the Appeals Council concluded, on November 16, 2005, that there was no basis upon which to grant Britton's request for review. (Tr. 6-8). The ALJ's findings and decision thus became final. Britton has timely filed her appeal of the ALJ's decision. 42 U.S.C. § 405(g). Both Britton and the Commissioner have filed Motions for Summary Judgment (Document Nos. 8 & 10). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 444 (Document No. 6). There is no dispute as to the facts contained therein.

### III.  Standard for Review of Agency Decision

The court's review of a denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The

findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. 42 U.S.C. § 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues *de novo*, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparro v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones v. Apfel*, 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV.  Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any

5

medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve months."

42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and

laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).  The impairment must be so severe as to

limit the claimant in the following manner:

> [she] is not only unable to do [her] previous work but cannot, considering [her] age,
> education, and work experience, engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of whether such work exists in the
> immediate area in which [she] lives, or whether a specific job vacancy exists for
> [her], or whether [she] would be hired if [she] applied for work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one

is suffering from a disability.  Rather, a claimant is disabled only if she is "incapable of engaging

in any substantial gainful activity."  *Anthony,* 954 F.2d at 293 (quoting *Milam v. Bowen*, 782 F.2d

1284 (5th Cir. 1986).

> The Commissioner applies a five-step sequential process to determine disability status:
>
> 1.  If the claimant is presently working, a finding of "not disabled" must be made;
>
> 2.  If the claimant does not have a "severe" impairment or combination of
> impairments, she will not be found disabled;
>
> 3.  If the claimant has an impairment that meets or equals an impairment listed in
> Appendix 1 of the Regulations, disability is presumed and benefits  are awarded;
>
> 4.  If the claimant is capable of performing past relevant work, a finding of "not
> disabled" must be made; and
>
> 5.  If  the claimant's impairment prevents her from doing any other substantial
> gainful activity, taking into consideration her age, education, past work experience,
> and residual functional capacity, she will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren*

*v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden

of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the

burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67 F.3d at 563.

Here, the ALJ found that Britton, despite her impairments and limitations, could perform light work restricted only to the extent that she should avoid hazards such as dangerous machinery, heights, and driving a motor vehicle, could perform her past relevant work, and that she therefore was not disabled within the meaning of the Act.  As a result, the Court must determine whether substantial evidence supports the ALJ's step four finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age.  *Wren*, 925 F.2d at 126.

## V.  Discussion

### A.  Objective Medical Evidence

The objective medical evidence shows that Britton was hospitalized on June 20, 2003, at Memorial Hermann Southwest Hospital for right-sided weakness.  When admitted to the hospital, Britton's blood pressure was 167/104.  (Tr. 180).  Britton was treated by Shahin Shirzadi, M.D., a neurologist, and by Lakshmi Seshadri, M.D., her primary care doctor.  Neurologic testing revealed "some give-way weakness over the right upper and lower extremities with some decreased pinprick sensation over the right upper extremities and face."  (Tr. 171, 173).  Because of the documented right sided weakness, Britton underwent an initial CT scan of the head without contrast on June 20,

2003.  That "emergency report" showed "questionable very small low densities at the posterior inferior aspects of the lentiform nuclei most typically represent prominent perivascular spaces.  If clinically indicated, MR with diffusion weighting would be more sensitive in detecting very small acutesubacute infarcts."  (Tr. 124, 212).  Additional tests were administered to Britton on June 20, 2003.  A chest x-ray showed "no evidence of active disease" and her heart was normal.  (Tr. 118, 125, 203).  Likewise, the results of a bilateral carotid artery doppler were normal.  (Tr. 145, 211). Because of the questionable findings in the initial June 20, 2003, CT, namely the very low density at the posterior inferior aspect of the lentiform nuclei, Britton underwent a "MRA Circle of Willis" on June 23, 2003.  (Tr. 96, 126, 246, 203).  According to the radiologist, it was "unremarkable MRA of the intra cranial arteries."  (Id.).  Similarly, the results of a MRI of the brain were unremarkable as there was no mass, mass effect or evidence of acute intra or extra-axial hemorrhage and "no abnormal signal was seen in the white matter.  No increased signal on diffusion-weighting to suggest acute/subacute infarct."  (Tr. 97, 127, 203).   In addition, Britton underwent an echocardiogram doppler examination, the outcome of which was normal.  (Tr. 101-102).  On June 23, 2003, Britton underwent a  digital EEG.  The EEG showed that "throughout the record, there are frequent sharp wave discharges noted over the left temporal head region with phase reversal at T3."  (Tr. 104). Britton was discharged from the hospital on June 23, 2003.  According to the discharge summary, Britton had "unspecified transient cerebral ischemia, speech disturbance, malaise and fatigue."  (Tr. 100).   Following her discharge from the hospital, Britton continued to be treated by Dr. Shirzadi. In a letter dated July 1, 2003, to Dr. Seshadri, Dr. Shirzadi wrote that Britton had "left temporal epileptic discharges and was placed on Dilantin 300 mg a day" and that "since her discharge from the hospital, she had no further spells."  (Tr. 201-202).  On September 25, 2003, Dr. Shirzadi again wrote to Dr. Seshadi.  (Tr.  196).  According to Dr. Shirzadi, Britton had no further seizures, she

had a normal neurological exam, and that a MRI that was taken on September 13, 2003[2], was unremarkable.  (Tr. 196).  Dr. Shirzadi stated that she would check Britton's Dilantin levels.  (Tr. 196).  As to Britton's Dilantin levels, blood work taken on July 7, September 25, October 21, and October 29, 2003, all revealed her Dilantin levels to be low.  (Tr. 197, 199, 195, 215).

On October 1, 2003, Britton had her first appointment with Dr. Seshadri since her hospitalization in June.  The treatment notes show that Britton was taking Dilantin and being followed by Dr. Shirzadi.  They further show that Britton had complained of left anterior chest pain.  In response, she had an EKG, which was normal.  Because Britton's blood pressure was 147/100, and because of earlier high readings, Dr. Seshadri prescribed Norvasc.  (Tr. 219).

Britton had another transient ischemic attack, which resulted in her being hospitalized at Ben Taub Hospital from December 12, 2003, through December 17, 2003.  (Tr. 231-263).  Britton reported right sided weakness.  The initial treatment note reveals that she had a mild right facial

---

[2] The results of the MRI of the brain with and without contrast were unremarkable.  The radiologist made the following findings:

  1.  No foci of abnormal signal intensity are identified in the brain.

  2.  No mass, mass effect and no evidence of subscute or chronic hemorrhage is seen.

  3.  No increased signal on diffusion-weighting to suggest acute/subacute infarct.

  4.  No abnormal intra or extra-axial enhancement is seen.

  5.  No internal change noted when compared to previous MR of brain without contrast dated June 22, 2003.  (Tr. 87, 88, 90).

To the extent that Plaintiff argues that the ALJ erred by failing to consider her initial CT scan which showed abnormalities such as lacunar infarcts, the medical records show that subsequent brain imaging tests (MRI and MRA of the brain) were all normal.  As such, the ALJ did not err as alleged by Plaintiff.

droop. Her blood pressure was 164/104 on December 12, 2003.[3]  In addition, laboratory tests taken on December 1, 2003, showed that Britton's Dilantin level was low, 2.9.  (Tr. 255, 309).  The next reading, which was taken on December 16, 2003, was 10.7, and within the desirable therapeutic range.  (Tr. 304).  Britton's blood work also revealed that she had high cholesterol so she was prescribed a cholesterol lowering medication and was advised to avoid foods high in cholesterol.  The results of an echocardiogram were normal.  (Tr. 251).  However, the results of an EEG were not.  (Tr. 250).  The report dated December 16, 2003 states:

> This is an abnormal EEG due to the presence of mild generalized slowing of the background.  This is a non-specific finding that suggests the presence of a diffuse disturbance of cerebral function though it may in part be related to medication effect. An excess of fast activity is present.  This can be seen as a medication effect. No focal, lateralized or epileptiform activity is present.  (Tr. 250).

The discharge summary states that Britton's primary diagnosis was a transient ischemic attack, and her secondary diagnosis were hypertension and seizure disorder.  With respect to seizures, Britton's treating physician, Dr. Byrd Shonte wrote:

> Given patient's Dilantin was low, the patient was loaded and on hospital day number two, therapeutic.  Dilantin was continued at 300 mg p.o. q.h.s. and again discussed with the patient the importance of taking her medication so as not to have another seizure.  (Tr. 235).

On March 11, 2004, Britton had another seizure, and fell, hitting the edge of a table.  She was taken by ambulance to the West Houston Medical Center.  (Tr. 266-275).  According to the initial treatment note, Britton had a left shoulder laceration and soft tissue swelling.  (Tr. 275).  Britton's blood pressure was 137/91.  (Tr. 274).  The nursing note reveals that Britton missed her dosage for seizures over the last twenty-four hours.  (Tr. 274).  An X-ray of Britton's right elbow was normal.  (Tr. 270).

---

[3] Britton's blood pressure was 147/88 on December 14, 2003.  (Tr. 247)  Subsequent readings show that her pressure was 147/88, which was within normal limits when discharged.

A seizure disorder sheet dated July 8, 2004, indicates that Britton has indeterminant or undetermined partial seizures, one to two a month, and that the results of her neurological exam, CT, MR and EEG were normal.  (TR. 301).

Britton was seen at the Ben Taub Hospital on September 1, 2004. Her blood pressure was 161/101.  Britton reported one seizure since her last visit with right sided weakness.  (Tr. 300).  Britton was also treated for anemia and iron deficiency on August 27, 2004, September 10, 2004, and September 23, 2004. (Tr.  323, 319, 317, 316).

On November 14, 2004, Britton underwent a sleep study at Methodist Hospital.  (Tr. 335-336).  The study showed that Britton has obstructive sleep apnea.  Also, Britton's "depression screening test results were elevated."  (Tr. 335).  Based on this diagnosis, Britton was urged to "attain and maintain ideal body weight."  (Tr. 336).  At a follow- up visit to a Harris County Hospital District clinic, in December 2004, Britton reported another seizure, which resulted in loss of bladder control, confusion and right sided weakness.  In addition, Britton's daughter voiced concerns about her mother's memory problems.  Britton was prescribed Zoloft for depression.  (Tr. 303).

A DDS physician, reviewing Britton's medical records, completed a Residual Functional Capacity Assessment–Physical Form on November 3, 2003.  The physician concluded that Britton had no exertional limitations and was restricted to common seizure precautions such as no climbing. (Tr. 222-229).

In this case, the ALJ sought the assistance of John Anigbogu, M.D., to evaluate the medical evidence available.  Dr. Anigbogu testified that with respect to Britton's seizure disorder, "it looks like it's partly controlled despite being on medications from her testimony but the record does not back that up."  (Tr. 427).  Dr. Anigbogu elaborated on this as follows:

Q.  So the record supports that she has them at least monthly.

11

A.  That's what I'm saying.  She probably does.  You know, but that's really the place that it was ever documented.  (Tr. 429).

*                                          *

Q.  In this case, is it your experience that normally seizure logs are a reliable, clinical indicator?

A.  Yes.

Q.  Okay.  So if we submitted the seizure log that Ms. Britton's daughter keeps for her to his Honor and show that there were seizures more often than once a month, would that, would you, based on that, if it showed that, then would you say that she meets the listing?

A.  I really wouldn't, because the problem you have right now is that her last EEG doesn't show any evidence of seizures.  So that really makes the whole more complex.  It looks like, so she has an epileptic from this thing when she was diagnosed.  You have an EEG which shows that she is slowing, but she doesn't have any seizures.  And then after those, that EEG was done, she was having this frequent seizure more than three or two times a month.  That, in itself, is severe.  Don't get me wrong, but the records do not support that.  So that's what I'm saying. So she probably needs to communicate that to her doctors.  Then she needs another level work-up to find out what is going on.  (Tr. 433-434).

*                                          *

Q.  You said that normally, if they had two EEGs that show these two different results, they should have referred her for a third.

A.  That's what I'm saying, if, because, that's what I'm, you see, she is, her testimony now shows that she is having at least anywhere from one seizure a week, which is about four seizures a month.  That does not reflect that in the records.  And also the early concrete evidence that she had in the record was the last EEG that she did, which does not show any epileptic from activities, but just shows that she is slowing.  So, based on that, which essentially telling you, she's not having any seizures.  So that's finally why they decided to keep her on Dilantin and don't change her medications.  So, if she can communicate to them that she is having this frequency of seizures all the time, I bet you that they are going to pretty much get another EEG and find out what is going on and decide whether they want to change her medication or not.  (Tr. 434-435).

*                                          *

Q.  And we can't really tell what the accurate picture is unless we have a third EEG?

> A.  Let her go back to her doctor and explain this to them, and then, if they are really [inaudible] they can decide work her up [inaudible] her neurologist.  I don't really know why she hasn't seen Dr. Chevatti [phonetic], who is her neurologist.  I don't know why she stop seeing him.  (Tr. 436).

In addition, Dr. Anigbogu testified as to the absence of medical records supporting Britton's testimony about her alleged back pain and hand numbness.  (Tr. 436, 437).  However, with respect to Britton's testimony about falling asleep six or seven times a day, for thirty to thirty five minutes, Dr. Anigbogu testified that such actions are consistent with sleep apnea, which affects an individual's ability to stay awake and that while a CPAP machine improves the condition, "it doesn't resolve it."  (Tr. 438).

Britton challenges the extent to which the testimony of the medical expert, Dr. Anigbogu, was relied upon by the ALJ.  Britton contends that the ALJ erred by denying her request for an EEG because there was not enough information in the record for the Medical Expert to make an *informed* decision about whether she met or equaled a listing for a seizure disorder because Dr. Anigbogu's testimony highlighted the deficiencies in the record concerning the frequency of Britton's seizures.  Even through the ALJ does not have the burden of proof at the first four stages, the ALJ does have a duty to fully and fairly develop the facts relevant to a claim for benefits.  *See Brock v. Chater*, 84 F.3d 726 (5th Cir. 1996); *James v. Bowen*, 793 F.2d 702, 204 (5th Cir. 1986); *Kane v. Heckler*, 731 F.2d 1216, 1219-1220 (5th Cir. 1984).  The failure by the ALJ to comply with this duty to develop the record constitutes error and results in a decision that is not supported by substantial evidence. When existing medical evidence is inadequate to make a disability determination, the Social Security Regulations impose a duty on the ALJ to develop the record by recontacting a claimant's medical sources or referring the claimant for a consultative medical examination.[4]  In addition,

---

[4] 20 C.F.R. § 404.1512 provides:
(e) Recontacting medical sources.  When the evidence we received from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a

Social Security Ruling 96-2p states that additional evidence or clarifying reports may be necessary when the treating source's medical opinion appears lacking or inconsistent.  Similarly, Social Security Ruling 96-5p requires the ALJ to make a reasonable effort to recontact a treating source who offers an ultimate issue opinion for clarification of the treating source's reasons when the ALJ cannot ascertain the basis of the opinion from the case record.  As such, where the existing medical evidence is inadequate to make an *informed* disability determination, the Commissioner has a duty to develop the record by recontacting a claimant's medical sources or by referring the claimant for a consulting exam.

Here, it is undisputed that upon this record the ALJ failed to properly develop the record, and as a result the ALJ's conclusions are not supported by substantial evidence.  In particular, the record is underdeveloped concerning Britton's seizure disorder and sleep apnea.  As to Britton's seizure disorder, the ALJ erred by not developing the record concerning the frequency, severity and controllability of Britton's seizures, and the impact, if any, of the loss of bladder control, mental confusion and weakness, which Britton experiences and which she claims affect her functional capacity .  Britton argues that her epilepsy meets listing 11.02, which requires that the claimant suffer from seizures at least once a month despite at least three months of prescribed treatment.  20

---

determination or a decision.  To obtain the information, we will take the following actions:

(1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available.  We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques...

(f) Need for consultative examination.  If the information we need is not readily available from the records of your medical treatment source, or we are unable to seek treatment source, or we are unable to seek clarification from your medical source, we will ask you to attend one or more consultative examinations at our expense.  20 C.F.R. § 1512(e)-(f).

C.F.R., pt. 404, subpt. P, ap. 1, § 11.02.  Here, Britton testified that her seizures occur frequently, and when they do occur, she loses consciousness, has urinary incontinence, afterwards feels weak, and has mental confusion.  In addition, Britton's testimony was corroborated by her daughter.  While some records are difficult to decipher, it appears that Britton reported seizures of one to two a month to her health care providers and none of the providers questioned this as documented in her July 8, 2004 seizure disorder sheet.   Moreover, as to Britton's compliance with taking her Dilantin, she testified that she was fully compliant with her medication and  her daughter testified that she gave her mother her medication and kept a seizure log.   As for the medical records, it is undisputed that Britton was loaded with Dilantin during her December 2003 hospitalization and upon discharge was urged to take her medication as prescribed, and in March 2004, Britton reported that she missed a dosage.  Both notations in the medical records arguably support the ALJ's finding that Britton was noncompliant in taking her seizure medication.  On the other hand, the December 2003 record further suggests that the therapeutic drug monitoring range was impacted by an excess of fast activity and the July 2004 seizure report form does not state that Britton has been non-compliant with her medication. Given Britton's testimony, which was corroborated by her daughter, concerning the frequency, severity and controllability of her seizures, and given the testimony of the medical expert of the need for another EEG, further development of the record is warranted.

In addition, Britton argues that the ALJ failed to consider her sleep apnea and obesity. The record shows that the ALJ mentioned the sleep study and Britton's weight.  However, the ALJ failed to evaluate obstructive sleep apnea as an impairment and the impact, if any, obstructive sleep apnea

has on Britton's RFC.[5]  On remand, the ALJ should reconsider Britton's sleep apnea as a severe

impairment, as it was interpreted in the November 14, 2004, sleep study.

Finally, Britton contends that the ALJ erred in not considering her depression and its impact

on her RFC.  The Commissioner correctly notes that Britton has not been treated for depression by

a specialist in the mental health care profession but instead was prescribed Zoloft, an antidepressant

medication, by the doctor treating her seizure disorder, and based on this absence of care by a mental

health professional, the ALJ concluded that Britton's depression had no impact on her residual

functional capacity.  The Court has not found, and the Commissioner does not cite to any case

authority requiring a claimant such as Britton to obtain medical treatment from a specialist.  Here,

Britton's primary care physician prescribed Zoloft, and Britton and her daughter testified about her

depression.  In addition, the summary of Britton's sleep study indicates that she presented symptoms

consistent with depression.  On remand, the ALJ should consider whether Britton has any functional

limitations due to depression.

## B.  Diagnosis and Expert Opinion

---

[5] Britton argues that the ALJ erred by not evaluating her obesity.  Here, the ALJ noted that Britton weighed 202 pounds, in connection with her sleep study.  He did not, however, discuss what effect her obesity, in combination with her other impairments, primarily her sleep apnea, would have on her ability to work. *See Social Security Ruling* 02-1p, 2000 WL 628049, at *1, *5-*6, *7 (stating that obesity is a medically determinable impairment that ALJ must consider in evaluating disability; that combined effect of obesity with other impairments can be greater than effects of each single impairment considered individually; and that obesity must be considered when assessing RFC). According to SSR 02-1p, an ALJ should consider the effects of obesity together with the underlying impairments, even if the individual does not claim obesity as an impairment.  But a failure to explicitly consider the effects of obesity may be harmless error.  Here, the ALJ implicitly took into account Britton's weight.  Moreover, other that the sleep study, which encouraged Britton to lose weight, no medical opinion in the record identified obesity as significantly aggravating her physical impairments or contributing to any physical limitations.  Britton fails to point to any other evidence suggesting that her obesity exacerbated her physical impairments.  Because Britton failed to "specify how [her] obesity further impaired [her] ability to work," and because the record relied upon by the ALJ sufficiently considered her obesity, any error by the ALJ was harmless.

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweiker*, 653 F.2d 997, 1001 (5th Cir. 1981).  For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusional and must be supported by clinical and laboratory findings.  *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).  Indeed, "[a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with ... other substantial evidence.'"  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995)).  The opinion of a medical specialist is generally accorded more weight than opinions of non-specialists.  *Id.*   "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez,* 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).  Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176.

The Social Security Regulations provide a framework for the consideration of medical opinions.  Under 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), consideration of a physician's opinion must be based on:

(1)     the physician's length of treatment of the claimant,

(2)     the physician's frequency of examination,

(3)     the nature and extent of the treatment relationship,

(4)     the support of the physician's opinion afforded by the medical evidence of

record,

(5)     the consistency of the opinion with the record as a whole, and

(6)     the specialization of the treating physician.

*Newton,* 209 F.3d at 456.  While opinions of treating physicians need not be accorded controlling weight on the issue of disability, in most cases such opinions must at least be given considerable deference.  *Id.*  Again, the Social Security Regulations provide guidance on this point.  Social Security Ruling 96-2p provides:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling (SSR) 96-2p, 61 Fed. Reg.34490 (July 2, 1996).  With regard to the weight to be given  "Residual Functional Capacity Assessments and Medical Source Statements," the Rule provides that "adjudicators must weigh medical source statements under the rules set out in 20 C.F.R. 404.1527 ... providing appropriate explanations for accepting or rejecting such opinion."  *Id.*

The Fifth Circuit adheres to the view that before a medical opinion of a treating physician can be rejected, the ALJ must consider and weigh the six factors set forth in 20 C.F.R. § 404.1527(d).  *Newton,* 209 F.2d at 456.  "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council."  *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so.").  However, perfection in administrative proceedings is not required.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

18

This factor neither weighs in favor of nor against the ALJ's decision because the ALJ did not reject an opinion of Britton's treating physician.

### C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render her disabled. *Cook,* 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Darrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hames,* 707 F.2d at 166.

Here, Britton testified about her condition. Britton testified that she has two seizures a month, during which she is unconscious, has no bladder control, and afterwards feels disoriented. (Tr. 386). Also, Britton testified about her sleep problems. According to Britton, she sleeps during the day. (Tr. 389). She estimated that she rests four times a day for fifteen to twenty minutes, otherwise, she falls asleep. (Tr. 393- 394). Britton estimated she could lift ten pounds, walk about

two blocks, sit for an hour, and stand in place for thirty to thirty-five minutes.  (Tr. 393-395).
Britton testified that her hands shake and she drops things.  (Tr. 396).  Also, Britton testified that
she lives with her daughter and grandchildren.  Britton testified that she watches her grandchildren
but does not care for them.  (Tr. 401).  According to Britton, she is never left alone.  Rather, either
her sister or her daughter is with her.  (Tr. 400-401).  Britton stated that she does no cooking, no
dishwashing as she drops things, no housework, no driving, no grocery shopping, and has no
activities outside the house.  (Tr. 400-403, 405).  Britton testified that she takes Zoloft for depression
and anxiety.  (Tr. 397).  As to the onset of her seizures, Britton testified that "I don't know when it
is going to hit me."  (Tr. 413).  Also, Britton testified that she takes her medication as scheduled.
(Tr. 385, 393).

Also testifying was Britton's daughter, Aquinella Mandel. Ms. Mandel testified that Britton
has lived with her since she started having seizures in July 2003.  (Tr. 415).  Ms. Mandel testified
that Britton has a seizure every other week and that she keeps a log of Britton's seizures.  (Tr. 415).
Because Britton cannot detect the onset of a seizure, either Ms. Mandel or Britton's sister stays with
her.  (Tr. 417-418).  Ms. Mandel testified that her mother easily falls asleep.  (Tr. 418-419).
According to Ms. Mandel, her mother does no housework and does not even do dishes because she
drops things.  (Tr. 419).  Finally, Ms. Mandel testified that she gives her mother her medication and
keeps a log of her seizures.  (Tr. 421, 422).

Here, the ALJ's basis for finding Britton not credible, namely that she could care for her
grandchildren, misstates and misconstrues Britton's testimony to the extent that it implies that she
is able to do more for her grandchildren than she actually does.  Britton testified that she is home
when they come home from school and she might help with their homework but she does not care
for her grandchildren.  Britton and her daughter both testified that Britton is never left alone at the
house.  Either Britton's sister or her daughter stays with her.  Because the ALJ made and supported

his credibility determination based upon his residual functional capacity assessment, which should

be reconsidered on remand because that assessment is inextricably intertwined with the objective

evidence, and because the ALJ misconstrued the evidence, this factor weighs against the ALJ's

determination.

### D.  Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and

present age.  A claimant will be determined to be under disability only if the claimant's physical or

mental impairments are of such severity that she is not only unable to do her previous work, but

cannot, considering her age, education and work experience, engage in any other kind of substantial

gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that Britton, at the time of the hearing,  was fifty-eight years old, and had

completed high school. Britton's past work was as a security guard supervisor, a nursing aide, a

substitute teacher, a truck driver, a deputy court clerk, and a drug coordinator.  The ALJ questioned

Karen Nielsen, Ph.D., a vocational expert ("VE"), at the hearing about Britton's ability to do her

past work and her ability to engage in other gainful work activities.  "A vocational expert is called

to testify because of his familiarity with job requirements and working conditions.  'The value of

a vocational expert is that he is familiar with the specific requirements of a particular occupation,

including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d

129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well

settled that a vocational expert's testimony, based on a properly phrased hypothetical question,

constitutes substantial evidence.  *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).   A

hypothetical question is sufficient when it incorporates the impairments which the ALJ has

recognized to be supported by the whole record.  Beyond the hypothetical question posed by the

ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's

hypothetical questions (including additional disabilities not recognized by the ALJ's findings and

disabilities recognized but omitted from the question)." *Bowling,* 36 F.3d at 436.

The ALJ posed the following hypothetical question to the VE:

Q.  Okay.  All right.  Let me give you a hypothetical.  A claimant at this claimant's age, education and background, past relevant work at the medium level.  And at the medium level, I'm going to give you a little description of what the doctor [inaudible] restriction might be avoidance of hazardous heights, vibrations and dangerous machinery operation, and those machinery operation would include motor vehicle.  With that restriction, are there any jobs that such a claimant could perform?

A.  With that hypothesis, she could do her nurse assistance job.

Q.  Any other jobs?

A.  Yes, at the medium, semi-skilled labor.  It would be an assembler which would be medium semi-skilled and a [inaudible] which would be medium semi-skilled.  (Tr. 440).

*                                        *

Q.  Okay.  Let's give you another hypothetical at the light exertional level.  Same restriction as the previous one, but at a reduced level, which would be the light exertional level.  Any jobs of that?

A.  Well, her substitute teaching, the drug coordinator and general clerk, those would all be light, semi-skilled?

*                                        *

Yes, There's also like an order detailer.

*                                        *

Uh-huh.  Or a school information detailer, those are all light semi-skilled.  An administrative clerk in the school district, which is light, semi-skilled.  (Tr. 441).

The record further shows that Britton's attorney also posed a hypothetical question to the VE.  The

VE was asked:

Q.  Ms. Nielsen, given a hypothetical claimant, who's at the medium exertional level, but who falls asleep six or seven times during the time of an eight-hour work day, and during those times she falls asleep unpredictably, she can sleep up to 30 minutes

or until she's awaken by her co-workers.  Would such a claimant be capable of any of those [inaudible]?

A.  Well, unscheduled work break that's repetitive throughout the day, eliminates all competitive employment at all levels.

Q.  And if there were only four episodes of falling asleep, once again unscheduled?

A.  Unscheduled work breaks at any of your work sites, that would eliminate all levels.

Q.  And if we just, and I don't know if this is a hypothetical you're comfortable with or not, then let me know.  If we accept claimant's testimony as being completely true, with all of the limitations that she's described, except excluding the falling asleep, would such a claimant be capable of maintaining competitive employment?

A.  With all of the problems that she is having, and she reported today, I would say that would eliminate competitive employment if they were all substantiated.

Q.  And that's even if we are leaving out that hypothetical of falling asleep?

A.  Yes.  (Tr. 442-443).

Given that the matter should be remanded for further record development, which may affect the ALJ's assessment of Britton's residual functional capacity, which was incorporated in the hypothetical questions posed to the Vocational Expert, on remand, the ALJ should reconsider Britton's ability to perform her past relevant work, or any work.


## V.  Conclusion

Based on the foregoing, and the conclusion that a further development of the record is necessary because substantial evidence does not support the ALJ's finding that Britton could perform light work, and because the ALJ failed to develop the record, and that based on these infirmities in the ALJ's opinion substantial evidence does not support the ALJ's decision,[6] it is

---

[6] With respect to Britton's contention that the ALJ is biased against all social security claimants and is incapable of rendering a fair and impartial decision, Plaintiff has not shown bias on the part of the ALJ in this case against her or that she has been prejudiced.  Upon this record, the

ORDERED that Defendant's Motion for Summary Judgment (Document No. 8), is DENIED, that Plaintiff's Motion for Summary Judgment (Document No. 10) is GRANTED, and this case is REMANDED to the Social Security Administration pursuant to sentence four of 42 U.S.C. §405(g), for further proceedings consistent with this Memorandum and Order.

Signed at Houston, Texas, this 7th day of February, 2007.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE

---

failure by the ALJ to fully develop the record does not rise to the level of judicial bias.  This argument fails.